Newton V. Prince v. Commissioner.
Prince v. Commissioner
Docket No. 38804.
United States Tax Court
T.C. Memo 1954-214; 1954 Tax Ct. Memo LEXIS 32; 13 T.C.M. (CCH) 1097; T.C.M. (RIA) 54320; December 8, 1954, Filed *32 The deficiency for 1941 held not barred by the statute of limitations prescribed in section 275(a) of the Internal Revenue Code of 1939 since petitioner omitted from gross income more than 25 per cent of the gross income stated in his return for that year. Income of petitioner, the sole proprietor of a small department store and other retail stores, redetermined for the years 1941 through 1944 and the deficiencies for those years adjusted accordingly. The deficiencies for 1941 through 1944 were not due in whole or in part to fraud with intent to evade tax. The 50 per cent additions to tax for those years imposed by respondent, disallowed. The deficiencies for 1941 through 1944 were due, at least in part, to negligence. The five per cent addition to tax is applicable to the deficiencies for those years. Petitioner and his wife were bona fide partners in 1945 in the businesses formerly conducted by the petitioner. Sidney B. Gambill, Esq., for the petitioner. Stanley Schoenbaum, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent determined deficiencies and 50 per cent additions to tax for fraud as follows: 50%
Year
Deficiency
Penalty
1941
Income
$ 1,636.81
$ 818.41
1942
Income
3,751.08
1,875.54
1943
Income and Victory
4,939.98
2,469.99
1944
Income
16,300.26
8,150.13
1945
Income
7,252.24
None
$33,880.37
$13,314.07
By amended answer, respondent has asserted *34 alternatively that if the additions to tax for fraud are disallowed in this proceeding, petitioner is liable for five per cent additions to tax for negligence for each of the years 1941 through 1944. The questions presented are as follows: 1. Were any parts of the deficiencies for 1941 through 1944 due to fraud with intent to evade tax within the meaning of section 293(b) of the Internal Revenue Code of 1939? 2. Is the assessment of any deficiency for 1941 barred by the three-year statute of limitations prescribed by section 275(a) of the Internal Revenue Code of 1939? This question depends alternatively upon our answer to the question of fraud or whether petitioner omitted from gross income more than 25 per cent of the gross income stated in his return for 1941 within the meaning of section 275(c) of the Internal Revenue Code of 1939. 3. Did respondent correctly determine petitioner's income from the operation of a department store and other stores for each of the years 1941 through 1944? The correctness of the deficiencies for those years depends on this question. 4. Was any part of the deficiency for each of the years 1941 through 1944 due to negligence within the meaning *35 of section 293(a) of the Internal Revenue Code of 1939? 5. Was petitioner's wife a bona fide partner in 1945 in the businesses formerly conducted by petitioner? Other adjustments covered in the notice of deficiency have been conceded and will be given effect under Rule 50. Findings of Fact Petitioner is an individual residing at Fuquay Springs, North Carolina. His separate returns for the years 1941 through 1945 were filed with the collector of internal revenue for the district of North Carolina. A partnership information return was filed by petitioner and his wife for the taxable period February 1, 1945, through December 31, 1945. Petitioner was 43 years of age at the date of the hearing. He left Duke University in 1929 after one year of college and started working with his father and his uncle in a general merchandise store. He has been continuously engaged in business since leaving college. Since he was about six years old, petitioner has lived in Fuquay Springs, a town of about 2,000 located some 25 miles from Raleigh, North Carolina. Petitioner has never before been involved in litigation, civil or criminal, and enjoys an excellent reputation in his community, as *36 does his wife, Nancy B. Prince. Beginning January 1, 1941, petitioner operated, as a sole proprietorship, a small department store in Fuquay Springs under the name of Prince's Department Store. The department store had previously been operated as Prince's, Inc., a corporation in which petitioner originally owned 50 per cent of the stock. Petitioner purchased the remaining stock in 1940 and liquidated the corporation as of December 31 of that year. The closing inventory reflected on the corporate return for 1940 was $9,956.69. From July 16, 1943, to the end of that year, the petitioner also operated a grocery and dry goods store known as Sessoms & Prince. The stores operated in 1943 were likewise operated by petitioner through 1944 and until February 1, 1945. From February 1, 1945, until the end of that year, the stores were operated under the name of Newton V. Prince and Nancy B. Prince, T/A Prince's Department Store; Ladies and Children's Shop; and Sessoms & Prince Dry Goods and Grocery. The Ladies and Children's Shop was a department of Prince's Department Store which first came into being in 1944. All of the sales clerks in the stores in question had authority to ring up their *37 sales on the cash registers throughout the years involved and they regularly did so. At the end of each day, readings were taken from the registers, sometimes by the manager and sometimes by petitioner. The register readings were balanced daily by starting with the register reading in the morning, determining the amount of starting cash in the register, determining the register reading at the end of the day, and subtracting the morning reading and the starting cash. In this fashion the amount taken in each day was ascertained. A record was made of the cash register readings which was turned in to the bookkeeper employed by petitioner throughout the years 1941 through 1945. Sales tickets were made out for each sale and placed beside the cash registers for the purpose of balancing the register readings at the end of each day. Duplicate copies of the tickets were available to customers. Petitioner prepared his own income tax returns for 1941 and 1942. Early in 1944, petitioner felt the need of an overhaul of his bookkeeping system and sought the advice of the local bank. An official of the bank recommended George R. Poole, a certified public accountant in Raleigh, North Carolina. *38 At petitioner's request, Poole traveled to Fuquay Springs in February 1944 to confer with petitioner, taking with him John A. William, Jr., a young accountant who had just joined Poole's firm. After conferring with the accountants, petitioner indicated that he wanted to employ Poole's firm to take over all his accounting and income tax matters and to install a complete and modern bookkeeping system. Petitioner had prepared informal schedules of sales and expenses for 1943, listed in columns on the back of stationery in an informal fashion. Williams inquired as to the origin of those figures and petitioner explained that he had summarized his transactions for the year. It appeared to Williams that petitioner had followed a reasonable procedure and that if his mechanics in working out this procedure were accurate, a correct statement of net income would result. Because of the manpower shortage created by the war then in progress, the Poole firm was unable to go into petitioner's records and verify his figures, and in preparing petitioner's 1943 return Williams accepted the data furnished by petitioner. Throughout 1944, Poole's firm was working under such pressure that it was unable *39 to return to petitioner's place of business to set up a new bookkeeping system. In December 1944, Williams became a certified public accountant in North Carolina. Early in 1945, petitioner turned over to the Poole firm all the records which he had kept for the year 1944, consisting of a daybook, bank statements, and cancelled checks. The daybook was the daily record of cash register readings showing total sales and the amounts of cash paid out for merchandise and expenses. Notations on most of the cancelled checks indicated the purpose of the expenditures. Using those records and whatever information was available from invoices and vouchers, Williams prepared petitioner's 1944 return. The pressure was still very great in the Poole office. Poole had had a heart attack the previous October and had been out of the office for about six weeks. He suffered another heart attack early in May 1945 and died on July 25, 1945. Shortly thereafter Williams and one Frank Chapman purchased the accounting practice of Poole. Shortly after Poole's death, while discussing with an attorney the cases then in the office, Williams told him that from a cursory look at petitioner's accounts he thought *40 there were some indications that the income tax returns for prior years might have substantially understated income. The attorney suggested that if there had been substantial understatement, a full and complete voluntary disclosure should be made by petitioner, whether any fraud was present or not, so as to protect petitioner from any possibility of criminal prosecution. The attorney explained very carefully to Williams that a voluntary disclosure to be effective had to be made before an examination was begun by an internal revenue agent and that it had to be a complete disclosure of all pertinent facts which might have a bearing on the situation. The attorney suggested that immediate steps be taken to ascertain any possible means by which petitioner's income might have been understated in prior years and requested Williams to discuss the matter with him further. Subsequent to the conference between Williams and the attorney, Williams called on petitioner and asked numerous questions regarding the possibility of errors in prior years. Petitioner indicated that he did not think he could add anything to what was shown by the records. Although he had made no audit, Williams felt that *41 there was insufficient time to go into the records in any detail and insisted that a voluntary disclosure be made immediately to protect petitioner from any possibility of criminal prosecution. In an effort to anticipate every possible error which might be turned up by an audit, Williams questioned petitioner further about every phase of the business. Petitioner told Williams that he had kept currency in his safe from time to time for business purposes but that he had no currency in his safe at that time. In answer to Williams' inquiry about bank accounts, petitioner stated that he had had bank accounts which were not a part of the records of the business, those accounts being a personal account and an appliance account. When Williams inquired about the appliance account, petitioner stated that he had been engaged in the appliance business before World War II and that no records of that business were available. Williams inquired as to whether petitioner had paid for all groceries his family had used from the grocery store. Petitioner replied that his wife did the marketing on an allowance, paying cash for the groceries, or sometimes accumulating tickets until the end of the week. *42 He indicated there was a possibility his wife might have taken some groceries without making a record of them. Williams prepared a memorandum as a result of his conference with petitioner. In that memorandum there was listed every possible means that Williams could imagine which petitioner could have used for diverting income, with an amount opposite each item which Williams considered in excess of the remotest figure that might be shown by the audit. Williams did not know at that time whether an actual understatement of income had in fact occurred. Williams took the memorandum to the attorney's office where it was decided that the attorney would ask for an immediate examination of the books, records and returns. The attorney assured Williams that the facts as determined by audit would be the controlling facts regardless of any overstatement of estimates and that the records would speak for themselves. The attorney then paraphrased Williams' memorandum and incorporated it into a letter directed to the Commissioner of Internal Revenue and signed only by the attorney. The completed letter dated October 9, 1945, was delivered by the attorney and Williams to an official in the Bureau *43 of Internal Revenue in Washington, with a complete explanation of the circumstances under which the letter had been written. A request was made that the Bureau official have an immediate examination made of petitioner's records. The letter indicated that it was intended as a voluntary disclosure on behalf of petitioner as to what was believed to be unreported tax liability for the years 1941 through 1944. It stated that, so far as petitioner knew, no investigation of his affairs had begun or contemplated and that the disclosure was for the purpose of eliminating any possibility of criminal prosecution. The letter specifically pointed out that no final and detailed audit had been made and that the figures supplied were estimates. The estimated unreported income for the four-year period was as follows: 1941
$ 4,000.00
1942
7,600.00
1943
6,700.00
1944
8,500.00
Unrecorded receipts
10,000.00
Total
$36,800.00
The nature of the "unreported income" was shown as follows: 1. Cash sales not recorded or reported and the currency held in the safe in the business, 2. Cash sales not recorded or reported, the proceeds of which were deposited in a bank account not *44 shown on any of the records of the business, 3. The operation of an appliance business, separate and apart from the stores mentioned above, of which no sales or expenses were recorded or reported and that the net profits were used by the taxpayer personally, 4. Cash was taken from the business, from cash sales which were not reported, in amounts sufficient to defray substantially all of the personal expenses of Mr. Prince. In addition to the amounts enumerated above, it was stated that there appeared to be an arbitrary increase of $3,000 in the inventory as of January 1, 1941, as against the inventory of December 31, 1940. After this letter was written, Williams made a complete audit of petitioner's books with respect to the years 1941 through 1945. More than 1,000 man hours were spent on the job by Williams and his associates. In the course of the audit, Williams found no entry which indicated to him that he had been justified in making any disclosure on behalf of petitioner, there being not a single ficitious entry in all of petitioer's records, nor any evidence of concealed income. An internal revenue agent who subsequently audited petitioner's accounts found that every *45 entry was honestly made without intent to mislead, and that all of petitioer's income was entered on the books. None of the deficiencies for any of the years in question was due in whole or in part to fraud with intent to evade tax. It was not until June 1946 that Williams finally got around to installing a bookkeeping system for petitioner, a system which began to operate on July 1, 1946. Petitioner had been waiting for Williams to do this work since the first conference with Williams and Poole in February 1944. The following schedule shows the income and deductions reported by petitioner on his 1941 return, the income and deductions determined by Williams shown in the schedule under the heading "Per Accountant's Audit", the income and deductions determined by the respondent and reflected in the statutory notice of deficiency shown under the heading "Per Statutory Notice" and the difference between the figures shown in the return and the amounts determined by the respondent: 1941
Difference
Between
Per
Per
Per
Return and
Return
Accountant's
Statutory
Statutory
Filed
Audit
Notice
Notice
SALES
$32,244.96
$32,618.37
$33,653.44
$ 1,408.48
COST OF SALES: Beginning Inventory
$13,136.67
$13,136.67
$ 9,956.69
$ 3,179.98
Purchases
25,599.42
25,577.95
25,584.76
14.66
TOTAL
$38,736.09
$38,714.62
$35,541.45
$ 3,194.64
Ending Inventory
15,187.60
15,187.60
15,187.60
COST OF SALES
$23,548.49
$23,527.02
$20,353.85
$ 3,194.64
GROSS PROFIT
$ 8,696.47
$ 9,091.35
$13,299.59
$ 4,603.12
EXPENSES: Salaries
$ 1,886.19
$ 1,886.19
$ 1,886.19
Interest
484.71
218.03
218.03
$ 266.68
Bad Checks
322.96
59.84
59.84
263.12
Depreciation
301.84
359.55
301.84
Telephone
41.94
39.29
41.94
Freight and Express
450.66
450.67
450.67
( .01)
Delivery and Travel
343.60
343.60
43.60
300.00
Miscellaneous
649.88
371.15
649.88
Rent
780.00
780.00
780.00
Light, Heat and Water
391.24
388.24
388.24
3.00
Advertising
252.47
266.60
266.60
(14.13)
Insurance
67.90
67.90
Supplies
35.31
35.31
(35.31)
Alterations
62.78
62.78
(62.78)
Postage
31.08
31.08
(31.08)
Repairs
21.00
21.00
(21.00)
Refunds and Miscellaneous
11.26
11.26
(11.26)
Dues and Subscriptions
30.00
30.00
(30.00)
Taxes
1,086.43
1,086.43
(1,086.43)
Bank Charges
.27
.27
( .27)
TOTAL EXPENSES
$ 5,973.39
$ 6,441.29
$ 5,715.08
$ 258.31
Net Income from Department Store
$ 2,723.08
$ 2,650.06
$ 7,584.51
$ 4,861.43
Plus "Unrecorded Sales"
4,158.75
4,158.75
TOTAL NET INCOME
$ 2,723.08
$ 2,650.06
$11,743.26
$ 9,020.18
*46 Sales in 1941 amounted to $32,618.37. Petitioner expended at least $343.60 in 1941 in travel and related expenses, and $371.15 for miscellaneous business expense not otherwise classified. The figures shown in the above table under the column labeled "Per Statutory Notice" for Beginning Inventory, Purchases, Depreciation, and Telephone are the correct amounts for those items. The item of $4,158.75 labeled "Unrecorded Sales" by respondent was arrived at by totaling the following: Loans by petitioner to the business
in 1941
$1,669.60
Payments by petitioner on personal
notes in 1941
512.50
Year-end balance in bank account
for appliance business
$ 22.55
Petitioner's withdrawals from the
business in 1941
1,954.10
Total
$4,158.75 Petitioner's total net income for 1941 was $5,878.29. During 1942 petitioner operated one store under the name of Prince's Department Store. The following schedule shows the details of the income and deductions reported by petitioner in his return, the income and deductions determined by Williams after completing his audit, the income and deductions determined by the revenue agent and reflected in the statutory notice of deficiency, *47 and the difference between the figures shown in the return and the amounts determined by respondent: 1942
Difference
Between
Per
Per
Per
Return and
Return
Accountant's
Statutory
Statutory
Filed
Audit
Notice
Notice
SALES
$54,283.56
$60,190.61
$60,190.61
$ 5,907.05
SALES TAX COLLECTED
2,592.19
2,592.19
TOTAL INCOME
$54,283.56
$60,190.61
$62,782.80
$ 8,499.24
COST OF SALES: Beginning Inventory
$15,187.60
$15,187.60
$15,187.60 $ Purchases
48,762.23
50,467.71
50,467.71
(1,705.48)
TOTAL
$63,949.83
$65,655.31
$65,655.31
[1,705.48)
Ending Inventory
21,525.50
21,525.50
21,525.50
COST OF SALES
$42,424.33
$44,129.81
$44,129.81
[1,705.48)
GROSS PROFIT
$11,859.23
$16,060.80
$18,652.95
$ 6,793.76
EXPENSES: Salaries
$ 2,849.67
$ 3,338.78
$ 3,338.78
$ (489.11)
Interest
806.65
536.63
536.63
270.02
Taxes
106.10
273.83
1,723.52
(1,617.42)
Depreciation
301.84
423.68
301.84
Rent
790.00
790.00
790.00
Freight and Express
652.99
652.99
Telephone
43.18
42.41
42.41
.77
Miscellaneous
300.69
300.69
Heat, Light and Water
514.61
382.34
382.34
132.27
Advertising
615.49
173.53
173.53
441.96
Delivery Expense
44.75
43.35
43.35
1.40
Travel
227.50
227.50
Insurance
222.30
46.50
46.50
175.80
Supplies
80.74
80.74
( 80.74)
Alterations
71.90
71.90
( 71.90)
Postage
66.56
66.56
( 66.56)
Repairs
56.90
56.90
( 56.90)
Refunds
27.72
27.72
( 27.72)
Bank Charges
.60
.60
( .60)
Bad Checks
102.94
102.94
(102.94)
Donations
16.00
16.00
( 16.00)
TOTAL EXPENSES
$ 7,475.77
$ 6,474.41
$ 7,802.26
$ (326.49)
Net Income from Department Store
$ 4,383.46
$ 9,586.39
$10,850.73
$ 6,467.27
Plus: "Unrecorded Sales"
2,462.53
2,462.53
"Canvas Sales"
2,396.91
2,396.91
TOTAL NET INCOME
$ 4,383.46
$ 9,586.39
$15,710.17
$11,326.71
*48 The amount deductible by petitioner for taxes for 1942 was $1,723.52. Allowable depreciation for 1942 was $301.84. Petitioner's total net income for 1942 was $10,850.73. Prior to 1943, petitioner's father, J. W. Prince, and petitioner's uncle by marriage, J. K. Sessoms, operated a grocery and dry goods store in Fuquay Springs under the name of "Sessoms & Prince". In 1943, petitioner entered into an agreement with his father and his uncle whereby he leased their business for a period of three years with the privilege of renewing the contract at the end of three years. Petitioner assumed operation of that business on or about July 16, 1943. It was agreed that when petitioner ceased to lease the business he would return to the owners money or merchandise equivalent in value to that leased by him. Furniture and fixtures of the store were also included in the lease and the petitioner agreed to return this equipment at the end of the lease or to purchase it at its fair market value if he should buy the stock of merchandise. Petitioner agreed to pay the owners $300 per month as rental during the continuance of the lease. During the period July 16, 1943, to December 31, 1943, he *49 paid rentals amounting to $1,687.50 to his father and his uncle under the agreement. In early 1945 petitioner and his wife acquired ownership of the Sessoms & Prince store from petitioner's father and uncle, J. K. Sessoms, and their respective wives. In exchange for all of the right, title and interest of the previous owners, petitioner and his wife promised to pay $150 per month to his father and mother during their joint lives and to the survivor during his lifetime and an additional $150 per month to J. K. Sessoms and his wife during their joint lives and to the survivor for his life. When Williams discussed with petitioner the matter of preparing his 1943 income tax return, petitioner explained to Williams that he had entered into an arrangement with his father and his uncle for the operation of the Sessoms & Prince store. Williams did not completely understand the arrangement and thought that it constituted a type of partnership. The income from the operation of the store was not reported in petitioner's 1943 return but was reported in a partnership return for a fiscal period ending June 30, 1944. Petitioner reported the income in his personal tax return for 1944. Williams *50 subsequently examined the arrangement and determined that it constituted a lease. Williams intended to file amended returns for 1943 and 1944 wherein the operations of the store would be correctly reported by petitioner but before he did so the examination by the agent had begun and Williams decided to straighten it out in connection with the over-all examination rather than by filing amended returns. The following schedule shows the income and deductions reported by petitioner on his 1943 return from the operation of the department store, the income and deductions determined by Williams, following his audit, the income and deductions determined by the revenue agent and reflected in the statutory notice of deficiency, and the differences between the figures shown in the return and the amounts determined by respondent: 1943
Difference
Between
Per
Per
Per
Return and
Return
Accountant's
Statutory
Statutory
Filed
Audit
Notice
Notice
SALES
$80,700.18
$80,902.55
$80,902.55
$ 202.37
SALES TAX COLLECTED
3,033.51
3,033.51
$80,700.18
$80,902.55
$83,936.06
$ 3,235.88
COST OF SALES: Beginning Inventory
$21,525.30
$21,525.50
$21,525.50
[ .20)
Purchases
64,857.34
64,689.08
64,689.08
168.26
TOTAL
$86,382.64
$86,214.58
$86,214.58
$ 168.06
Ending Inventory
27,299.93
27,299.93
27,299.93
COST OF SALES
$59,082.71
$58,914.65
$58,914.65
$ 168.06
GROSS PROFIT
$21,617.47
$21,987.90
$25,021.41
$ 3,403.94
EXPENSES: Telephone
$ 44.77
$ 43.87
$ 43.87
$ .90
Advertising
684.61
261.18
261.18
423.43
Lights and Water
399.77
397.30
397.30
2.47
Interest
113.77
113.77
Repairs
162.58
178.30
178.30
( 15.72)
Salaries
5,545.44
5,918.68
5,918.68
(373.24)
Insurance
568.86
599.22
599.22
( 30.36)
Travel
351.50
351.50
Supplies
314.24
99.24
99.51
214.73
Rent
795.00
780.00
780.00
15.00
Freight and Express
786.38
786.38
Postage
26.29
27.07
27.07
( .78)
Alterations
88.80
90.00
90.00
( 1.20)
Taxes
2,821.01
128.41
2,872.62
( 51.61)
Delivery
270.00
351.50
351.50
( 81.50)
Depreciation
326.04
439.75
315.91
10.13
Refunds and Miscellaneous
548.37
548.37
(548.37)
Bad Checks
10.59
10.59
( 10.59)
Donations
31.40
31.40
( 31.40)
Error in Addition
.05
.05
TOTAL EXPENSES
$13,299.11
$ 9,904.88
$12,525.52
$ 773.59
Net Income from Department Store
$ 8,318.36
$12,083.02
$12,495.89
$ 4,177.53
*51 The amounts deductible by petitioner arising from the department store operation for 1943 for the following expenses are: Supplies
$ 99.51
Taxes
2,872.62
Depreciation
315.91
The following schedules show, for the period from July 16, 1943, to December 31, 1943, the income and deductions determined by Williams after his audit, the income and deductions determined by the respondent's agent as reflected in the statutory notice of deficiency, and the differences between the amounts determined by Williams and the amounts determined by the agent with respect to the Sessoms & Prince grocery department and dry goods department leased by petitioner: GROCERIES
Per
Per
Accountant's
Statutory
Audit
Notice
Difference
Sales
$41,396.03
$41,396.03 $ Earned Discounts
Sales Tax Collected
364.79
364.79
Total Income
$41,396.03
$41,760.82
$ 364.79
Cost of Sales: Beginning Inventory
$ 5,846.17
5,846.17
Purchases
36,200.83
36,200.83
Total
$42,047.00
$42,047.00
Ending Inventory
6,029.86
6,029.86
Cost of Sales
$36,017.14
$36,017.14
Gross Profit
$ 5,378.89
$ 5,743.68
$ 364.79
Expenses: Freight and Express
Supplies
$ 9.25
$ 9.25
Salaries
1,885.19
1,885.19
Rent
220.00
220.00
Light, Heat and Water
142.63
142.63
Advertising
258.85
273.85
$ (15.00)
Repairs
186.68
186.68
Refunds and Miscellaneous
120.79
133.81
(13.02)
Telephone
48.38
48.38
Taxes
414.39
414.39
Insurance
43.00
43.00
Lease Expense
825.00
825.00
Total Expenses
$ 4,154.16
$ 3,357.18
$ 796.98
Net Income
$ 1,224.73
$ 2,386.50
$1,161.77
*52 In operating the Sessoms & Prince Grocery Department in 1943, petitioner expended $273.85 for advertising, $133.81 for refunds and miscellaneous, and $825 rental. DRY GOODS
Per
Per
Accountant's
Statutory
Audit
Notice
Difference
Sales
$16,274.55
$16,274.55
Earned Discounts
219.28
$ 219.28
Sales Tax Collected
471.60
471.60
Sales Tax Paid
Total Income
$16,274.55
$16,965.43
$ 690.88
Cost of Sales: Beginning Inventory
$ 7,253.08
$ 7,253.08
Purchases
10,812.63
11,093.20
$ (280.57)
Total
$18,065.71
$18,346.28
$ (280.57)
Ending Inventory
5,708.10
5,708.10
Cost of Sales
$12,357.61
$12,638.18
$ (280.57)
Gross Profit
$ 3,916.94
$ 4,327.25
$ 410.31
Expenses: Freight and Express
$ 136.72
$ 136.72
Supplies
10.12
10.12
Salaries
802.40
802.40
Rent
230.00
230.00
Light, Heat and Water
26.23
26.23
Advertising
176.47
176.47
Repairs
13.01
13.01
Refunds and Miscellaneous
26.90
26.90
Telephone
Taxes
8.00
115.40
(107.40)
Insurance
153.24
153.24
Lease Expense
862.50
862.50
Total Expenses
$ 2,445.59
$ 1,537.25
$ 908.34
Net Income
$ 1,471.35
$ 2,790.00
$1,318.65
Petitioner's deductible *53 taxes in 1943 arising from operation of the Sessoms & Prince Dry Goods Department were $115.40. Insurance premiums were paid in the amount of $153.24, and rental in the amount of $862.50. Purchases for the Dry Goods Department amounted to $11,093.20 and earned discounts were $219.28. The following is a consolidation of the three preceding tables, showing also the "Unrecorded Sales" and "Canvas Sales" added to income by respondent in determining the deficiency for 1943: Difference
Between
Per
Per
Per
Return and
Return
Accountant's
Statutory
Statutory
Filed
Audit
Notice
Notice
Income from Dept. Store
$ 8,318.36
$12,083.02
$12,495.89
$ 4,177.53
Plus: "Unrecorded Sales"
1,440.51
1,440.51
"Canvas Sales"
458.78
458.78
Profit from S. & P. Grocery Department
1,224.73
2,386.50
2,386.50
Profit from S. & P. Dry Goods Depart-
ment
1,471.35
2,790.00
2,790.00
Total Net Income
$ 8,318.36
$14,779.10
$19,571.68
$11,253.32
Petitioner's net income for 1943 was as follows: From department store
$12,495.89
From Sessoms & Prince Grocery De-
partment
1,561.50
From Sessoms & Prince Dry Goods
Department
1,774.26
Total Net Income
$15,831.65
*54 In assembling the information for petitioner's 1944 income tax return, Williams and his staff compiled a summary of the Sessoms & Prince operations for the year but inadvertently failed to include that data in consolidating the information for the return. The following schedule shows the income and deductions reported by petitioner on his 1944 return from the operation of the department store, including the Ladies and Children's Shop, the income and deductions determined by Williams, following his audit, the income and deductions determined by the respondent's agent as reflected in the statutory notice of deficiency, and the differences between the figures shown in the returns and the amounts determined by the agent: Difference
Between
Per
Per
Per
Return and
Return
Accountant's
Statutory
Statutory
Filed
Audit
Notice
Notice
Sales
$88,736.69
$87,036.96
$87,063.90
($ 1,672.79)
Sales Tax Collected
4,676.76
4,676.76
Total Income
$88,736.69
$87,036.96
$91,740.66
$ 3,003.97
Cost of Sales: Beginning Inventory
$27,299.93
$30,368.03
$30,368.03
($ 3,068.10)
Purchases
55,229.92
51,834.50
50,749.10
4,480.82
Total
$82,529.85
$82,202.53
$81,117.13
$ 1,412.72
Ending Inventory
20,830.67
20,830.67
20,830.67
Cost of Sales
$61,699.18
$61,371.86
$60,286.46
$ 1,412.72
Gross Profit
27,037.51
25,665.10
31,454.20
4,416.69
Expenses: Salaries
$ 6,775.59
$ 6,648.36
$ 6,648.36
$ 127.23
Advertising
657.39
380.53
380.53
276.86
Supplies and Postage
395.83
195.13
195.13
200.70
Heat and Light
549.61
437.93
437.93
111.68
Travel Expenses
200.00
253.09
203.09
( 3.09)
Drayage
275.00
701.50
701.50
(426.50)
Cash Shortage
86.19
86.19
Bad Checks
76.40
17.52
17.52
58.88
Miscellaneous
47.27
177.55
177.55
(130.28)
Repairs
282.97
270.61
270.61
12.36
Rent
780.00
715.00
715.00
65.00
Taxes
178.89
359.99
2,237.03
(2,058.14)
Insurance
340.51
475.20
475.20
(134.69)
Depreciation
438.39
495.37
372.37
66.02
Franchise and Franchise Costs
850.08
850.08
Alterations
23.20
23.20
23.20
(23.20)
Telephone
47.62
47.62
(47.62)
Dues and Subscriptions
10.00
10.00
(10.00)
Interest
.79
.79
( .79)
Donations
30.00
Total
$11,934.12
$11,239.39
$12,913.43
($ 979.31)
Net Income from Department Store, in-
cluding Ladies' and Children's Shop
$15,103.39
$14,425.71
$18,540.77
$ 3,437.38
*55 Petitioner expended at least $253.09 in 1944 in travel on business of the department store. The figures shown in the above table under the column labeled "Per Statutory Notice" for Sales, Purchases, Taxes, Depreciation and Donations are the correct amounts for those items. The following schedules show for the year 1944 the income and deductions determined by Williams after his audit, the income and deductions determined by respondent's agent as reflected in the statutory notice of deficiency, and the differences between the amounts determined by Williams and the amounts determined by the agent with respect to the Sessoms & Prince grocery department and dry goods department for the year 1944: 1944
GROCERIES
Per
Per
Accountant's
Statutory
Audit
Notice
Difference
Sales
$86,743.88
$86,743.88
Earned Discounts
Sales Tax Collected
94.03
$ 94.03
Total Income
$86,743.88
$86,837.91
$ 94.03
Cost of Sales: Beginning Inventory
$ 6,029.86
$ 6,029.86
Purchases
72,751.39
72,751.39
Total
$78,781.25
$78,781.25
Ending Inventory
4,527.06
4,527.06
Cost of Sales
$74,254.19
$74,254.19
Gross Profit
$12,489.69
$12,583.72
$ 94.03
Expenses: Freight and Express
Supplies
$ 25.48
$ 25.48
Salaries
3,637.32
3,637.32
Rent
480.00
480.00
Light, Heat and Water
366.13
366.13
Advertising
239.39
239.39
Repairs
32.79
32.79
Refunds and Miscellaneous
306.60
345.88
(39.28)
Telephone
116.23
116.23
Dues and Subscriptions
Bank Charges
1.25
1.25
Taxes
433.54
423.66
9.88
Depreciation
88.14
88.14
Contributions
Insurance
Legal and Audit
Lease Expense
1,800.00
1,800.00
Total Expenses
$ 7,526.87
$ 5,756.27
$1,770.60
Net Income from Sessoms & Prince
Grocery Department
$ 4,962.82
$ 6,827.45
$1,864.63
*56 The amounts deductible for 1944 arising from operation of the Sessoms & Prince Grocery Department for the following items are: Refunds and Miscellaneous
$ 345.88
Taxes
423.66
Lease Expense
1,800.00
1944
DRY GOODS
Per
Per
Accountant's
Statutory
Audit
Notice
Difference
Sales
$27,141.33
$27,141.33
Earned Discounts
1.77
1.77
Sales Tax Collected
831.72
$ 831.72
Total Income
$27,143.10
$27,974.82
$ 831.72
Cost of Sales: Beginning Inventory
$ 5,708.10
$ 5,708.10
Purchases
19,005.06
18,945.27
$ 59.79
Total
$24,713.16
$24,653.37
$ 59.79
Ending Inventory
5,961.97
5,961.97
Cost of Sales
$18,751.19
$18,691.40
$ 59.79
Gross Profit
$ 8,391.91
$ 9,283.42
$ 891.51
Expenses: Freigh and Express
$ 160.30
$ 160.30
Supplies
44.14
44.14
Salaries
2,266.45
2,266.45
Rent
480.00
480.00
Light, Heat and Water
43.77
43.77
Advertising
233.76
233.76
Repairs
61.55
61.55
Refunds and Miscellaneous
11.92
157.47
($ 145.55)
Telephone
Dues and Subscriptions
10.00
10.00
Bank Charges
Taxes
125.01
1,172.25
(1,047.24)
Depreciation
Contributions
40.00
40.00
Insurance
172.00
172.00
Legal and Audit
136.06
136.06
Lease Expense
1,800.00
1,800.00
Total Expenses
$ 5,584.96
$ 4,755.75
$ 829.21
Net Income from Sessoms & Prince Dry
Goods Department
$ 2,806.95
$ 4,527.67
$1,720.72
*57 Petitioner's deductible taxes arising from operation of the Sessoms & Prince Dry Goods Department in 1944 amounted to $1,172.25 and lease expense was $1,800. The figures shown in the above table in the column labeled "Per Statutory Notice" for Purchases, Refunds and Miscellaneous, Dues and Subscriptions, Contributions, and Insurance are the correct amounts for those items. In determining the deficiency for 1944, respondent added to income "Unrecorded Sales" of $13,668.85, consisting of petitioner's drawings for the year, his payments on notes in 1944, the year-end balance in the appliance account, and "Investments" of $5,464.15. Petitioner's net income for 1944 was as follows: From department store, including
Ladies' and Children's Shop
$18,490.77
From Sessoms & Prince Grocery
Dept.
5,027.45
From Sessoms & Prince Dry Goods
Dept.
2,727.67
Total Net Income
$26,245.89
Early in 1945 petitioner, his wife and the accountant, Williams, discussed the formation of a partnership between petitioner and his wife for the operation of the stores previously run by petitioner. On or about February 1, 1945, petitioner and his wife entered into a partnership agreement. *58 Nancy B. Prince invested $2,500 in the business, which amount she withdrew from a savings account she had previously intended to use for the purchase of a new home. It was orally agreed between petitioner and his wife that the stores would be operated as a partnership, that petitioner would receive a salary of $400 a month, and that the remaining profits would be equally shared between them. A new account number for Social Security taxes was obtained and the North Carolina authorities were advised of the change in proprietorship of the businesses. Williams closed the single proprietorship books on January 31, 1945, and determined petitioner's individual income for the month of January. The partnership return for the last 11 months of 1945 showed income from the stores amounting to $24,674.26. It showed further that after payment of petitioner's salary, he and his wife each had distributable earnings in the amount of $9,937.13. Nancy B. Prince did not withdraw any cash from the business. Her account was debited when checks were drawn on the partnership bank account and signed by petitioner to pay her state and Federal income taxes. Nancy B. Prince contributed various services *59 to the partnership. She assisted in buying and marking stock and looked after the displays in the ladies' ready-to-wear department. When there was a shortage of clerks, she sold merchandise. She came to the stores every day but did not spend regular hours in the stores although she sometimes spent an entire day and stayed late into the evening. She frequently traveled to New York and other cities on buying trips and was in charge of buying for the ladies' ready-to-wear department. In 1946 the partnership assets were transferred to a newly organized corporation known as Prince's Enterprises, Inc. Stock certificates were made out to petitioner for 209 shares, to Nancy B. Prince for 41 shares, and to P. G. Melton for one share. The stock certificates were not physically delivered to the named owners but were retained in and attached to the original stock book. The number of shares made out to petitioner and his wife was in proportion to their partnership capital accounts at the time of dissolution of the partnership. The capital account of Nancy B. Prince for this purpose was her original capital contribution, plus her share of the undistributed partnership earnings. Petitioner and *60 his wife did in good faith and with a business purpose intend to join together as partners in the conduct of the businesses previously operated by petitioner. At least a part of the deficiency for each of the years 1941, 1942, 1943 and 1944 was due to negligence on the part of the petitioner. Opinion ARUNDELL, Judge: This case presents a number of questions covering five different years. Respondent contends that at least a part of the deficiency for each of the years 1941, 1942, 1943 and 1944 was due to fraud with intent to evade taxes, and has applied, accordingly, the 50 per cent addition to tax prescribed by section 293(b) for each of those years. We think there is nothing in this record to sustain a finding of fraud with intent to evade income tax in any of the years before us. Not only has respondent failed to carry his burden of proving fraud but the testimony of his own witness, the internal revenue agent who audited petitioner's books, proves in our opinion that there was no fraud. The agent testified that throughout all of his work on petitioner's case he found that every item of income received by petitioner was entered in his books and records and that although there *61 were errors in the books there was not a single fictitious entry, every entry being an honest one not intended to mislead. That there were errors in reporting petitioner's income and deductions must be conceded, errors favorable and unfavorable to petitioner, but much of the difficulty arose from the inability on petitioner's part to get adequate accounting help during the war period. Respondent's argument on brief is essentially based on what he refers to as petitioner's admissions against interest in the letter of voluntary disclosure. Thus, respondent states flatly that petitioner "admits" he has persistently understated his income, failed to record cash receipts, and used bank accounts not reflected in his business records to conceal income. We think it obvious that the weight placed on the letter by respondent is wholly unwarranted. The accountant, Williams, admitted frankly that he had made a serious error in causing the letter to be prepared. As a young and relatively inexperienced accountant, upon whom unusual responsibilities were suddenly thrust, he erred in jumping to the conclusion at a premature stage of his initial audit that petitioner had failed to report all of *62 his income in earlier years. In an honest effort to protect his client, he sought the advice of an attorney of his acquaintance and was informed that if there were indeed substantial amounts of unreported income, it would be wise to disclose the omissions voluntarily before an audit was begun by the Government. Seizing upon this sound general advice but misapplying it to the particular situation, Williams apparently felt that the utmost haste was essential even at the expense of accuracy. Instead of completing his audit, he prepared a memorandum listing every means he could conceive by which petitioner could have realized unreported income, with a figure for each item sufficiently generous to cover amply the most remote figure which he thought might be disclosed by subsequent audit. It was this hastily prepared memorandum which was incorporated almost verbatim in the letter of voluntary disclosure. The subsequent investigations by both petitioner's accountant and the revenue agent showed clearly that there simply was no basis in fact for the statements in the letter. While the figures in the letter are to be considered as a part of the evidence, their value is nil when they are *63 shown to have had virtually no relation to the true facts. It follows that the 50 per cent additions to tax under section 293(b) must be disallowed. Before considering the correctness of the deficiencies, we must first consider petitioner's contention that the assessment of any deficiency for the year 1941 is barred by the three-year statute of limitations provided in section 275(a) of the Internal Revenue Code of 1939. Respondent, while conceding that the three-year period had expired, asserts that 1941 remains open by reason of the omission from gross income of more than 25 per cent of the amount of gross income stated in petitioner's 1941 return. [1]
Although the individual income tax return, Form #1040, for 1941 contains no item labeled "gross income", both parties treat $8,696.47 as the equivalent of gross income reported. One of the principal items in dispute with regard to this issue is the correct beginning inventory for the department store for 1941. *64 Petitioner reported beginning inventory of $13,136.67. Respondent adjusted that figure to $9,956.69 which would increase gross income by $3,179.98, clearly more than the necessary 25 per cent. The inventory figure substituted by respondent was the closing inventory of the predecessor corporation, Prince's, Inc., as of December 31, 1940. We recognize that the corporation was an entity separate and distinct from the sole proprietorship and that petitioner is not bound by the corporation's closing inventory figure. On the other hand, the petitioner has offered no satisfactory explanation for the substantial discrepancy between the closing inventory of the corporation and the opening inventory of the proprietorship despite the fact that he was the sole stockholder at the time of the liquidation of the corporation. Moreover, petitioner's testimony as to the basis for the 1941 opening inventory was none too clear nor was any physical evidence offered to substantiate the contention that an actual count was made on January 1, 1941. All things considered, we are of the opinion that petitioner has not carried his burden of proving error in the determination of the respondent as to the opening *65 inventory figure for the department store in 1941. It follows that since income was understated by more than 25 per cent, the statute of limitations does not bar the assessment of deficiencies for 1941. Respondent has made several adjustments, disputed by petitioner, which are identical in principle in two or more of the years before us, differing only as to amount. Among these are the following: 1. In each of the years 1941 through 1944, respondent has added to petitioner's income an item labeled "Unrecorded Income". The amount added to income in each year is a total of two or more of these items: Loans to the business by petitioner, Investments by petitioner, Petitioner's withdrawals from the business, Payments on notes by petitioner, Year-end balance in appliance bank account. The testimony of the revenue agent as to these adjustments to petitioner's income was far from enlightening. The substance of it appears to hinge on the mention in the letter of voluntary disclosure of cash sales not recorded or reported. Being admittedly unable to find any direct proof of unrecorded transactions, the agent seems to have assumed that any cash shown by the books to have passed through *66 petitioner's hands must have been realized from unrecorded sales. There is nothing to justify such an assumption. He also referred to the totaling of these figures as an attempt to arrive at an estimate of petitioner's living expenses. These adjustments are clearly erroneous. Respondent has not based his deficiencies on a net worth or related theory and we think petitioner's living expenses are wholly immaterial. If his living expenses exceeded his reported income, it may well be that they were paid in part with money on hand. gifts, inheritances or other non-income funds and, with no net worth reconstruction involved, there was no necessity for petitioner to introduce evidence to that effect. Respondent, on brief, states that although the means of arriving at the total may have been unorthodox, the results are reasonable, and rests on the theory that petitioner has not borne the burden of proving error in respondent's computation. There was no need for petitioner to prove the error, respondent's witness having done so himself. Accordingly, we have eliminated these items in redetermining petitioner's income. 2. In computing petitioner's income for 1942, 1943 and 1944, respondent *67 has added to sales in each year the amount determined by him to have been collected by petitioner as sales tax. Respondent has correspondingly included in the allowable deductions for tax in each of those years the amounts determined by respondent to have been paid to the State of North Carolina. In his computations for those years, Williams has excluded sales tax collected from sales and has claimed no deduction based on sales taxes paid or accrued by petitioner. On brief, petitioner asserts that "This was clearly the proper course to be followed on the accrual method of accounting." Petitioner cites no authority for this contention nor does he explain why he has adopted an inconsistent position in his computation of petitioner's income for 1941 wherein he added sales tax collected to sales and included sales taxes paid in the deduction for taxes. The taxes in question apparently are those prescribed by the sales tax article of the Revenue Act, General Statute of North Carolina, 1943, sections 105-164 through 105-187. Section 105-165 provides in part as follows: "The tax upon the sale of tangible personal property in this state is levied as a license or privilege tax for engaging *68 or continuing in the business of a 'wholesale' or 'retail' merchant as defined in this article. Retail merchants may add to the price of merchandise the amount of the tax on the sale thereof, and when so added shall constitute a part of such price, shall be a debt from purchaser to merchant until paid, and shall be recoverable at law in the same manner as other debts. It is the purpose and intent of this article that the tax levied herein on retail sales shall be added to the sales price of merchandise and thereby be passed on to the consumer instead of being absorbed by the merchant." Section 105-168 provides for a tax of three per cent of the total gross sales of the business of every retail merchant with a limit of $15, however, as the maximum tax on any single article of merchandise. I.T. 2750, XIII-1 C.B. 48, dealt with the North Carolina sales tax imposed under the Emergency Revenue Act of 1933 of that state, the material provisions of which are essentially the same as the provisions of the legislation here involved. The ruling issued therein was in part as follows: "Inasmuch as under the above-quoted provisions of law the North Carolina sales tax is imposed upon the vendor, *69 he may deduct the amount paid or accrued as a tax under section 23(c) of the Revenue Act of 1932 in determining his net income for Federal income tax purposes. Where the vendor collects the tax from the vendee, he must include the amount so collected in his gross income for Federal income tax purposes. * * * "In the case of a vendor whose books are kept on an accrual basis, the amount of the tax actually accrued during the period covered by his Federal income tax return may be deducted in determining his net income. Where the vendor's books are kept on the cash receipts and disbursements basis, only the amount of the tax actually paid during the period covered by his Federal income tax return may be deducted in determining his net income." [Italics supplied.] The Commissioner has consistently so ruled as to similar statutes in other jurisdictions. Cf. I.T. 3909, 1948-1 C.B. 34 (R.I.); I.T. 4004, 1950-1 C.B. 35 (D.C.) and I.T. 4066, 1951-1 C.B. 26 (S. Car.) Petitioner has not convinced us that respondent erred in adding to sales the amounts determined by him to have been collected as sales taxes. It is not entirely clear from the *70 record whether petitioner's books were kept during the years in question on an accrual basis, on a cash basis, or whether they could be strictly classified. In any event, there is no evidence that any specific amount was actually accrued during the years before us for taxes. Petitioner argues in the alternative that if sales taxes collected are to be added to sales, he is entitled to an offsetting accrual in the same amount for taxes owing to the state. We find no merit in this contention. The statute does not impose liability to the extent of the amount collected. The amount owing to the state is to be computed on the basis of a percentage of gross sales. Moreover, the statute provides for specific exemptions from the sales tax where, under certain conditions, the sales are of such widely diverse commodities as commercial fertilizer, public school books, flour, meal, meat, lard, milk, molasses, salt, sugar, coffee, Holy Bibles, bread and rolls, and sales to the state or its subdivisions. We are not informed as to how many of these commodities were handled by petitioner or to what extent the sales during the years in question were exempt from the sales tax. We are, therefore, without *71 sufficient information upon which to base a finding or even a reasonable estimate as to the petitioner's liability to the State of North Carolina during the years in question. This being the case, it is clear that petitioner has failed to overcome the presumptive correctness of respondent's determinations as to the amounts deductible for taxes, which include the sales taxes actually paid to the State of North Carolina during the years in question. 3. Respondent has added to income for 1942 and 1943 additional items labeled "Canvas receipts." Petitioner does not dispute the fact that he sold tobacco canvas in those years, nor does he quarrel about the amount of such sales. He insists, however, that the over-all sales figures used by both petitioner and respondent already include the canvas sales. Respondent's agent testified that he assumed the canvas sales were not included because of certain notations in the business records pertaining to canvas sales other than the regular sales records. We are convined that the separate notations arose from the unusual nature of the canvas purchases and that the canvas sales were included in the over-all sales figures. We have eliminated those *72 items, therefore, in computing gross income. 4. Respondent has disallowed entirely the deductions claimed by petitioner for lease expense in the operation of the grocery and dry goods departments of Sessoms and Prince in 1943 and 1944. Respondent's disallowance is based on his contentions, first, that there is insufficient proof of payment and, second, that whatever was paid was in the nature of a capital expenditure. Our finding that the petitioner did in fact pay the claimed amounts is dispositive of respondent's first contention. We think, moreover, that there is no justification for treating the payments as capital expenditures. Respondent contends that the contract of sale executed in 1945 was nothing more than an extension of the original agreement since the amount to be paid monthly was the same under both arrangements. According to respondent, this makes it clear that the so-called lease was intended to be a sale. We think the fallacy in this argument is apparent. Under the lease, petitioner was obligated to pay $300 per month for a fixed period of three years or six years in the event he exercised the option to renew the lease. This is a very different thing from petitioner's *73 obligation following the sale to pay $150 per month to his father and mother during their joint lives and the life of the survivor, and $150 per month to his uncle and his wife during their joint lives and the life of the survivor. Petitioner, under the contract of sale, might have had to pay for many years and the total expense of acquiring the property might well have run to many thousands of dollars. After considering all of the evidence, we are of the opinion that prior to the execution of the contract of sale in 1945, the payments by petitioner were rents and nothing more and properly deductible as such. 5. Petitioner claimed delivery and travel expenses of $343.60 for 1941 and $253.09 for 1944, whereas respondent has disallowed a part of each deduction. We think the deductions are amply justified in light of uncontradicted testimony to the effect that in each year before us petitioner expended at least $1,000 for travel, meals and lodging while on buying trips to New York. We have given careful consideration to each of the remaining items as to which the parties have been unable to agree. Where petitioner has carried his burden of proof and satisfied us that his figures were *74 correct, we have used the figures submitted by him in redetermining income. Where the evidence has been insufficient to overcome the presumptive correctness of respondent's determinations, we have upheld his figures in recomputing petitioner's income. These adjustments are reflected in our findings of fact. The deficiencies for the years 1941 through 1944 will be redetermined on the basis of the income figures in our findings of fact. By amended answer, respondent has asserted that if petitioner is not liable for the 50 per cent addition to tax for fraud, he is liable in any event for the 5 per cent addition to tax for negligence provided by section 293(a) of the Internal Revenue Code of 1939 for each of the years 1941 through 1944. We think this position is well take. Although the question of negligence is one of fact, it is well settled that substantial understatement of income over a period of years, coupled with loose bookkeeping practices, is strong evidence of negligence. L. Glenn Switzer, 20 T.C. 759, 766, Watson-Moore Co., 30 B.T.A. 1197, 1207. This combination of factors is unmistakably present in the case at bar and we have found as a fact that *75 at least a part of the deficiency for each of the years 1941 through 1944 was due to negligence within the meaning of section 293(a). The 5 per cent addition to tax will be imposed for each of those years. The only question for decision as to the year 1945 is whether petitioner and his wife, Nancy B. Prince, were bona fide partners from February 1, 1945, to the end of that year in the conduct of the businesses previously operated by petitioner alone. The applicable test was laid down by the Supreme Court in the case of Commissioner v. Culbertson, 337 U.S. 733, in the following words: "The question is * * * whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." After considering carefully the various factors bearing *76 on the question, we have concluded that petitioner and his wife did in good faith and acting with a business purpose intend to join together as partners in the operation of the stores. We note that Nancy B. Prince contributed a substantial amount of capital to the business and that capital is an important income producing factor in a business of this nature. Petitioner's wife shared equally with him in undertaking to pay an indeterminate and possibly very large sum to the vendors of the Sessoms and Prince operations purchased in 1945 by petitioner and his wife jointly. She also rendered various services to the business for which she received no extra compensation although petitioner was to be paid nearly $5,000 per year for his services, in addition to his share of the profits. The accountant was instructed to notify governmental authorities of the change in proprietorship. He closed the books as of the date of the change and a separate bank account was opened for the partnership. Later when the assets were transferred to a corporation, Nancy B. Prince was allotted a proportionate share of the stock based on her capital account, including her share of undistributed partnership *77 profits. It follows that to the extent of deficiency for 1945 is based on respondent's refusal to recognize a valid partnership between petitioner and his wife and the partnership agreement as to distribution of profits, it must be set aside. Decision will be entered under Rule 50. Footnotes
1. Section 275(c), Internal Revenue Code of 1939↩. Respondent's alternative contention that 1941 remains open by reason of fraud has been disposed of by our finding that there was no fraud in any of the years before us.